**WM. A. SMITH CONTRACTING COMPANY, Inc. and Brown & Root, Inc.**

v.

**The UNITED STATES.**

**No. 102–67.**

United States Court of Claims.
July 16, 1969.

Jerome T. Wolf, Kansas City, Mo., for plaintiff, Joseph J. Kelly, Jr., New York City, attorney of record, Howard F. Sachs, Kansas City, Mo., of counsel.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, Washington, D. C., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

PER CURIAM:

This case was referred to Trial Commissioner Donald E. Lane * with directions to make recommendation for conclusions of law under the order of reference and Rule 99(c) on plaintiffs' motion and defendant's cross-motion for summary judgment. The commissioner has done so in an opinion and report filed on March 10, 1969, wherein such facts as are necessary to the opinion are stated. Plaintiffs have filed a request for review under Rule 55(b) (3) and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, it is concluded that the decision of the Appeals Board of the United States Department of Commerce is sup-

---

* Now a Judge of the United States Court of Customs and Patent Appeals. 355–879–69.

ported by substantial evidence, is not arbitrary or capricious, and is correct as a matter of law. Plaintiffs' motion for summary judgment is denied, defendant's cross-motion for summary judgment is allowed and plaintiffs' petition is dismissed.

## OPINION OF COMMISSIONER

LANE, Commissioner: In this case the court is called upon to review a decision of the Appeals Board of the United States Department of Commerce under the standards prescribed in the Wunderlich Act, Title 41 U.S.C. §§ 321–322. The decision of the Appeals Board was rendered on August 20, 1964. This case is before the court on plaintiffs' motion and defendant's cross-motion for summary judgment.

Plaintiffs are joint contractors, Wm. A. Smith Contracting Company, Inc., a corporation of the State of Missouri, and Brown & Root, Inc., a corporation of the State of Texas. On May 18, 1956, plaintiffs entered into contract, No. 14–26–002–352, with the Alaska Road Commission of the Department of the Interior for the construction of 37.-52 miles of unpaved roadway in the Territory of and now State of Alaska. The roadway to be constructed under the contract constituted a portion of the Denali Highway extending from the MacLaren River westward to the Susitna River. In 1956, after the contract was formed, the responsibility for road construction in Alaska was transferred from the Department of the Interior to the Department of Commerce pursuant to the Federal-Aid Highway Act of 1956, § 107(b), 70 Stat. 374, 377.

The contract called for excavation work at specified locations along the route of the highway and for placement of suitable excavated material as embankment, subgrade, shoulders, slopes, etc. The contract provided that no excavated material was to be wasted without permission. It further provided that material for embankments was to consist of suitable material approved by the engineer and that the embankments were to contain no muck.

During construction of the roadway, plaintiffs encountered frozen material in certain areas where excavation was required. Plaintiffs requested permission to waste the excavated frozen material and to substitute borrow material in the construction of embankments. The contracting officer did not permit such material to be wasted nor did it permit the substitution of borrow material to be made. Plaintiffs asserted that the frozen material was *permafrost* and that this was a condition which the defendant had represented would be no problem in the construction of the roadway. Plaintiffs further asserted that the excavated permafrost was not a suitable material for the formation of embankments because the permafrost thawed when excavated and became muck.

The contract contained, in its general provisions, the standard "Changes" and "Changed Conditions" clauses for construction contracts. The "Changed Conditions" clause provides for an equitable adjustment in the event that the contractor encounters subsurface or latent physical conditions differing materially from those indicated in the contract, or unknown physical conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract. The "Changes" clause authorizes the contracting officer to make changes, by written order, in the drawings or specifications of the contract and to make an equitable adjustment if the changes resulted in an increase or decrease in the amount due under the contract. Both clauses provide that, in case of a dispute concerning the adjustment to be made, the dispute shall be determined in accordance with the "Disputes" clause of the contract. Under the "Disputes" clause, the contracting officer is to decide any dispute concerning a question of fact arising under the contract which cannot be decided by agreement. The contractor is given the right to ap-

peal the decision of the contracting officer to the head of the department with which the contract was made, or his duly authorized representative.

The contractor submitted a claim to the contracting officer, pursuant to the "Disputes" clause of the contract, for additional compensation in the amount of $434,347.72 for the excavation and placement of the frozen material which it asserted was permafrost. The contracting officer decided that the contractor was not entitled to any adjustment in payment under the terms of the contract. An appeal from the decision of the contracting officer was filed with the Board of Appeals for the Department of Commerce. The Board of Appeals, after consideration of the proofs submitted by the contractor and the Government, held that the contractor, on the basis of its past experience and the information available to it regarding the conditions of the soil, should have anticipated that permafrost or frozen conditions would be encountered in the excavation work. The Board of Appeals denied the contractor's claim for additional compensation.

The contractor then filed a petition in this Court for a review of the decision of the Board of Appeals under the Wunderlich Act, Title 41 U.S.C. §§ 321–322. The plaintiffs assert that the Board was in error in denying their claim for adjustment under the "Changes" and "Changed Conditions" clauses of the contract. Further, plaintiffs assert that they are entitled to relief, outside the provisions of the contract, for breach of contract.

In order to evaluate the Board's decision, it is necessary to consider the circumstances existing prior to the formation of the contract. The work to be performed under the contract consisted of roadway construction in Alaska. Prior to the solicitation of bids for the contract, the Government issued a pre-bid notice advising prospective bidders of its intention to let a contract for the roadway construction in April 1956. The pre-bid notice was issued on August 25, 1955, in order to permit interested contractors an opportunity to inspect the construction area before the severe winter weather of Alaska made inspection impossible. It advised the contractors of the limited access to the construction area by small aircraft. The notice indicated that permafrost had not been encountered in any appreciable amount in the easterly half of the construction area, but that some permafrost could be expected in the area near the Susitna River. The notice mentioned that the pioneer nature of the work would present unpredictable construction problems resulting from such factors as frozen ground and deleterious materials. Prospective contractors were warned that no adjustment would be made under the contract for changed conditions or unknown conditions at the site of the work. Finally, the notice also indicated that a soil survey was being made and that the results would be included with the contract plans.

Pursuant to the pre-bid notice, plaintiffs' representatives visited the construction site in October 1955. Their inspection of the site included flying over the proposed route of the roadway, walking over a short distance of the proposed route, and visiting Government employees at the Glen Allen field office of the Alaska Road Commission. During the visit to the field office, plaintiffs' representatives and the Government employees discussed the soil conditions in the construction area. The Board of Appeals found that, in this visit, plaintiffs' representatives were informed of the availability of soil reports indicating that frozen material had been discovered in 93 soil samples out of 300 test locations from which samples were taken.

The Alaska Road Commission of the Department of the Interior then issued an invitation for bids on March 16, 1956. The invitation included a list of special provisions to be applied to all work performed under the contract by the contractor. One of the provisions specifically warned the contractor that

"this project consists of pioneer road construction situated in an area of Alaska in which permafrost commonly occurs." In addition, the special provisions expressly provided the following: "Permafrost encountered during field surveys and investigations has been shown on the plans, but the Alaska Road Commission makes no representations that permafrost will not be found in areas other than those shown." The contract plans indicated five locations at which permafrost had been encountered in the Government's preliminary investigations.

Plaintiffs, in response to the invitation, submitted a bid of $1,661,332.15 for the contract. This bid was accepted by the Government and a notice of award of the contract was sent to plaintiffs on May 11, 1956. The contract was executed on May 18, 1956, and it incorporated the special provisions for the roadway project which were submitted with the invitation for bids. Shortly thereafter, on May 25, 1956, notice to proceed under the contract was sent to the plaintiffs.

During the construction work, plaintiffs encountered frozen materials in areas where it was required to perform excavation under the contract. Plaintiffs requested permission from the contracting officer to change the elevation or grade of the proposed roadway in order to avoid the frozen ground. Permission to change the elevation or grade was denied. Plaintiffs also asked that they be permitted to waste the excavated frozen material and substitute borrow material as fill for the formation of the embankment of the roadway. This request was also denied. Thereafter plaintiffs completed the roadway construction by excavating the frozen material and placing the excavated material in the roadway as embankment. In the placement of the frozen material, it was necessary to allow the material to thaw, after it had been placed in the roadway, and then to allow the material to set in order to produce a road capable of supporting vehicles on its surface. While the material was thawing and setting, plaintiffs had to avoid running their construction equipment over the road. After the material became sufficiently set to support the construction equipment, plaintiffs returned to the area at which the material had been placed in order to finish the roadway to the desired grade.

Plaintiffs' claim for additional compensation involves two problems encountered in the construction work performed under the contract: first, the excavation of frozen material and, second, the utilization of the excavated frozen material in the construction of the roadway. It is plaintiffs' contention that, since the Government represented by pre-bid notice and oral representations that permafrost would be no problem in the roadway construction, plaintiffs are entitled to an adjustment under the "Changed Conditions" clause of the contract for the excavation of the frozen material. It is also plaintiffs' contention that, under the "Changes" clause of the contract, plaintiffs are entitled to an adjustment for placement of the frozen material in the roadway on the theory that the refusal of the contracting officer to permit the material to be wasted constituted a constructive change. Finally, plaintiffs contend that the requirement to use the excavated frozen material in the road construction amounted to a breach of contract by the Government.

The plaintiffs challenge the finality of the Board's decision with respect to specified questions of fact under the Wunderlich Act, 41 U.S.C. § 321, and request that this Court review the specified factual findings under the standards set forth in the Act. The following findings which plaintiffs deem arbitrary, capricious, grossly erroneous, and lacking in support by substantial evidence, appear in the discussion which follows.

1. The Board of Appeals for the Department of Commerce indicated that plaintiffs' inspection of the construction site in October of 1955 could and did reveal the difficulties involved in the con-

struction work resulting from the existence of permafrost and unstable materials.

2. The Board held that plaintiffs' inspection was inadequate and should have revealed the presence of permafrost.

3. The Board held that there was sufficient data available at the Glen Allen field office to give notice to plaintiffs' representatives of the presence of permafrost and poor construction materials.

4. The Board held that the plaintiffs could not properly conclude from the inspection of the construction site that permafrost and unstable materials would present no major problem in the construction of the roadway.

5. The Board held that seasonal frost could not be distinguished from permafrost.

6. The Board held that the soils encountered were relatively good construction materials and that any difficulty experienced with the materials should have been anticipated by plaintiffs.

7. The Board held that the soil surveys performed by the Government in 1955 and 1963 accurately determined the suitability of the soil as construction material.

8. The Board held that plaintiffs should have expected that even relatively good subgrade materials would be difficult to handle when excavated in a frozen condition.

9. The Board held that there is no convincing evidence that the conditions encountered differed from those warned against and to be expected.

The Board concluded from the available proofs that the conditions encountered in the construction work did not constitute either "Changes" or "Changed Conditions." In the opinion of the Board, plaintiffs, as experienced contractors, should have anticipated, from the available information regarding the construction project, that permafrost or frozen conditions would be encountered in the excavation required under the contract. The Board pointed out that plaintiffs had been warned, in the pre-bid notice, that frozen conditions would be encountered in the construction area. Furthermore, the contract contained a warning that the project consisted of pioneer construction in an area of Alaska where permafrost was a common condition. The data available to the contractors indicated that frozen conditions had been encountered in a substantial number of soil samples (93 out of 300) taken during a Government survey of the project area. On the basis of the above facts, the Board concluded that the Government had not warranted that permafrost or frozen conditions would not be encountered in areas other than those indicated in the contract plans, that the contractor should have anticipated that permafrost or frozen conditions would be encountered in the excavation work, and that plaintiffs should have expected that even relatively good subgrade materials would be difficult to handle when excavated in a frozen state.

■ In reviewing a decision rendered by a Board of Appeals in a contract case, the review standard with respect to findings of fact made by the Board is that prescribed in the Wunderlich Act, 41 U.S.C. § 321. Under the provisions of that statute, the decision of the Board shall be final and conclusive unless it is fraudulent, or capricious, or arbitrary, or so grossly erroneous as to imply bad faith, or is not supported by substantial evidence. In determining whether a particular fact finding is supported by substantial evidence, this Court has said: "A scintilla is not sufficient, nor is it enough that some pieces of testimony, in isolation and by themselves, could be said to underpin the finding." Farnsworth & Chambers Co. v. United States, 346 F.2d 577, 582, 171 Ct.Cl. 30, 38 (1965). The existence of some evidence in the administrative record to support the decision is insufficient, and it is necessary to consider the record as a whole to determine whether the decision is supported by substantial evidence. Hoffman v.

United States, 340 F.2d 645, 652, 166 Ct.Cl. 39, 51 (1964); Williams v. United States, 127 F.Supp. 617, 619, 130 Ct.Cl. 435, 441 *cert. denied* 349 U.S. 938, 75 S. Ct. 783, 99 L.Ed. 1266 (1955). Thus, in order to decide the question of substantial evidence, the evidence presented by both parties, including testimony elicited by cross-examination as well as direct examination, must be considered. Hoffman v. United States, *supra*. In a recent decision, this Court defined substantial evidence as that evidence which could convince an unprejudiced mind of the truth of the facts to which the evidence is directed. Koppers Co. v. United States, 405 F.2d 554, 558, 186 Ct.Cl. 142, 149 (1968). In said case this Court reiterated its position that the substantial evidence standard is satisfied when there is such evidence as might convince an unprejudiced mind of the truth of the facts to which the evidence is directed and convince a reasonable man to arrive at the same conclusion reached by the Board of Appeals.

It is plaintiffs' contention that the Board's decision includes findings that plaintiffs' inspection of the construction site, prior to the Government's invitation for bids, could and did reveal the difficulties to be encountered in the construction work; that plaintiffs' inspection was inadequate and should have revealed the difficulties; and that there was sufficient information available to plaintiffs at the Glen Allen field office to inform plaintiffs of the presence of frozen materials in the construction area.

The portion of the Board's decision which concerns the visit of plaintiffs' representatives to the construction site is set forth below:

On October 5, 1955, representatives of Smith, Brown and Root arrived in Alaska. On October 6, 1955, these representatives flew over the job landing at the western end where they talked to the personnel of the contractor working on an adjacent project. On October 7, 1955, the representatives of the contractor drove to the other end of the project and walked a short distance up the centerline of the project and then drove to the Glen Allen Soils Laboratory of the Alaska Road Commission. At the Soils Laboratory, they spoke to three Government employees—Messrs. Watson, Arndt, and Nichols. While there, they were informed of the availability of the soil reports, some of which were typed in final form, and the remainder of which were in field note form. They were also shown some of the soil samples, a map of the soil conditions in the project area, and pictures of the area. They asked for and were later provided with prints of some of the photographs. The testimony shows that they spent about one hour at the Glen Allen Laboratory.

At the time of their inspection of the project location, a fairly heavy cover of snow existed on the project and it was extremely difficult to obtain a good appraisal of the project. However, from the air it must be noted that this visit to the project by representatives of the contractor was made on October 5, 6, and 7, 1955, over a month after the pre-bid announcement had been issued. The testimony does not show why the contractor, aware of conditions in Alaska, delayed a month in making an inspection of the project when it should have been reasonably evident that a snowfall might occur and make an inspection extremely difficult. Other contractors did visit the site of the work and did discuss the work with the Government engineers at the site.

The testimony of Government witnesses indicates that there was available at the laboratory some 300 reports of soil tests on the project and that 93 of these reports showed that the ground tested had been frozen when the tests were made. These reports typed in final form are part of the hearing record.

This quoted portion of the decision indicates that the Board found, as a fact, that plaintiffs' representatives visited

the construction site in October 1955 and made an inspection of the site from the air and on the ground. The decision explains the circumstances of the inspection. It does not indicate, however, that the Board found that plaintiffs' representatives discovered, from their inspection, the difficulty to be encountered with frozen materials. Further, the Board did not find that this difficulty could have been discovered during the inspection. The Board's decision does point out shortcomings of plaintiffs' inspection, *i.e.*, that the inspection of the construction site was conducted from the air and only a short distance of the proposed roadway route was inspected on the ground, that at the time of the inspection there was a heavy cover of snow over the site, and that plaintiffs' representatives did not visit the construction area until more than one month after the Government issued its pre-bid notice in order to provide prospective contractors an opportunity to inspect. There is no indication in the Board's opinion that plaintiffs' inspection was considered inadequate under the circumstances existing at the time of the inspection. The Board did find that the inspection had only limited utility in informing plaintiffs of the conditions to be encountered in the construction area, and that one of the factors which accounted for the limited usefulness of the inspection was plaintiffs' delay in sending their representatives to visit the area. The Board did not decide whether the inspection should have revealed the conditions which were later encountered in the construction work, but it did imply that plaintiffs' inspection might have been more useful if performed more promptly after the issuance of the pre-bid notice. The above findings of the Board have ample support in the administrative record. The findings relating to the inspection which plaintiffs have ascribed to the Board's decision do not accurately reflect the holdings of the Board. For this reason, it is not necessary to consider whether these latter findings are supported by the record under the standards of the Wunderlich Act, *supra*.

A principal point of controversy concerns the events which occurred in the meeting of plaintiffs' representatives and the Government employees at the Glen Allen field office. The Board found that plaintiffs' representatives were informed of the availability of soil reports and were shown a map of soil conditions in the construction area, photographs of the area, and soil samples. In addition, the Board found that the soil reports showed frozen materials in 93 locations out of 300 locations from which soil samples were taken. It is plaintiffs' contention that the meeting at the Glen Allen field office revealed only that little or no permafrost was anticipated in the construction work. This contention is based upon plaintiffs' version of the events which transpired at Glen Allen. Plaintiffs assert that their representatives were informed that the construction work would follow glacial land formations (eskers and kames) which contained good construction material, that it had been the practice of the Alaska Road Commission to change the grade and alignment of roads in order to avoid permafrost, and that only limited amounts of permafrost had been encountered in the soil samples taken by the Government. It is the Government's position that there is substantial evidence in the administrative record to support the Board's findings with respect to the meeting at Glen Allen. Mr. Watson, an employee of the Alaska Road Commission at the Glen Allen field office, testified that the soil reports were present in the field office at the time of the meeting and that he showed the reports to plaintiffs' representatives. He also testified that Mr. Smith, one of the representatives, thumbed through the reports, glancing at some of the pages to obtain a general impression of the information contained in the reports. The other Government employees, Mr. Arndt and Mr. Nichols, present at the meeting, did not recall whether or not the soil reports were shown to plaintiffs' repre-

sentatives. Plaintiffs' representatives, Messrs. Huncke, Salm and Grassett, testified that the soil reports were not shown to them. Although there is conflicting evidence regarding the question of whether all the soil reports were brought to the attention of plaintiffs' representatives during the meeting at Glen Allen, it cannot be concluded from the whole record that the Board's finding with respect to this issue of fact was fraudulent, or capricious, or arbitrary, or not supported by substantial evidence. The Board's reliance upon the testimony of one witness, whose testimony is not corroborated by any other witness called by the same party and is contradicted by the witnesses for the opposing party, does not render the finality of the finding of fact reached by the Board reviewable under the standards set forth in the Wunderlich Act. The Board of Appeals, as the original trier of fact, is in the best position to determine the credibility of the witnesses examined and the weight to be accorded to the testimony presented by the witnesses. In this case, plaintiffs have not shown that the Board was arbitrary or capricious in relying upon the testimony of Mr. Watson, and his testimony with respect to the circumstances of the meeting at Glen Allen does constitute substantial evidence in support of the Board's finding that plaintiffs' representatives were informed of the availability of the soil reports at the Glen Allen field office.

Plaintiffs also challenge the Board's ultimate holding, in effect, that plaintiffs could not properly conclude from the inspection of the construction site that permafrost and unstable materials would present no major problem in the construction work. The Board's holding with respect to the conclusions which plaintiffs should have reached on the basis of the available information was stated as follows:

> The Board believes that an experienced contractor, as this man was, should have expected, with the foregoing knowledge, that permafrost or frozen conditions would be encountered

in excavating material from many of the cuts on this project. The Board believes that a bidder on this project should have expected that even relatively good sub-grade materials, as the evidence indicates the materials encountered on this project were, would be difficult to handle when they were excavated in a frozen condition.

This finding by the Board was not based solely upon the information acquired from the inspection, but, upon all of the sources of information relating to the construction site which were available to the plaintiffs. In reaching its decision, the Board considered the warnings concerning frozen ground and permafrost contained in the pre-bid notice and the contract documents, the fact that the proposed route of the roadway was situated in an area of Alaska where it was generally recognized that permafrost was present and where severe seasonal frosts were known to occur, the soil reports available at the Glen Allen field office indicating frozen conditions in the construction area, and the fact that plaintiffs were experienced contractors who had previously performed construction work in Alaska. It is plaintiffs' contention that the only substantial evidence in the record shows that plaintiffs were led to believe that permafrost would present no problem in the construction project. Plaintiffs point out that the contract drawings indicated permafrost in only five areas along the proposed roadway route, and that only one of these areas involved excavation. Plaintiffs assert that their representatives relied upon this specific information to conclude that only five areas of permafrost were discovered in the Government's survey and permafrost would not be a problem in the construction work. They further assert that the only evidence upon which the Government can rely in support of its position that the difficulty should have been anticipated by plaintiffs is the general warnings which appear in the pre-bid notice and the contract and the attempt by the Government to modify the standard

"Changed Conditions" clause of the contract. In plaintiffs' view, the conclusions that plaintiffs should have been on notice of the existence of permafrost on the basis of the general warnings in the contract documents and that they could not rely upon the specific information supplied by the Government were arbitrary, capricious, grossly erroneous and not supported by substantial evidence.

In this case, there was no misrepresentation by the Government with respect to the existence of permafrost in the construction area. The contract drawings showed that permafrost had been discovered at five locations in the construction area. The drawings provided no indication of the soil conditions outside of these areas, and the special provisions of the contract provided that "* * * the Alaska Road Commission makes no representations that the permafrost will not be found in areas other than those shown." The administrative record indicates that plaintiffs actually did anticipate permafrost would be encountered in areas other than those indicated in the plans. In a letter to the Contracting Officer for the Alaska Road Commission, dated July 9, 1957, plaintiffs admitted the following: "We anticipated that we would encounter some permafrost outside the areas indicated on the plans. We did not anticipate that we would encounter permafrost and unstable material with such frequency or in such large quantities." Plaintiffs' claim for an equitable adjustment as compensation for the cost of excavating and handling all of the permafrost encountered in excess of the amount indicated in the contract plans is inconsistent with their admission that additional permafrost was anticipated.

In the case of Morrison-Knudsen Co. v. United States, 345 F.2d 535, 539–540, 170 Ct.Cl. 712, 720 (1965), this Court held that, in spite of a representation by the Government that no permafrost had been encountered in test borings at the construction site when, in fact, permafrost was actually known to be present, the contractor could not have reasonably been misled by the Government's misrepresentation to believe that no permafrost would be encountered in the construction work. In the Court's opinion, the contractor was well aware that some permafrost might be encountered because the contractor was experienced in the area and had general knowledge of the existence of permafrost in the vicinity of the construction site, because the contract specifically informed the contractor of the likelihood of encountering permafrost, and because the data concerning permafrost encountered in the test borings was only a portion of the information furnished to the contractor and the other information indicated the presence of permafrost at other locations within the construction area. Since there was no misrepresentation by the Government in the present case, the circumstances are even more compelling than the facts of the *Morrison-Knudsen* case, *supra,* to lead to the conclusion that the present plaintiffs were not misled with respect to the existence of permafrost in the construction area by the information supplied by the Government and that it should have anticipated that permafrost would be encountered at locations other than those shown in the contract plans. Thus, it cannot be concluded that the Board's finding that plaintiffs should have expected to encounter permafrost in the construction work was fraudulent, or capricious, or arbitrary, or grossly erroneous, or not supported by substantial evidence.

It is also contended by plaintiffs that the Board's decision incorporates a holding that seasonal frost could not be distinguished from permafrost, and such holding contravenes the requirements of the Wunderlich Act. The Board found that there was no evidence indicating that the frozen conditions encountered were necessarily permafrost. This finding is supported by the testimony of an employee of the Alaska Road Commission, of the president of one of the plaintiff companies, and of an expert in geology describing the difficulty of distinguishing seasonal frost from perma-

frost. This testimony indicated that it would be possible to distinguish the two types of material by considering the depth at which the frozen conditions were encountered, the geographic location, the surface conditions at that location, the time of year, and the weather conditions previously existing at that location, or by determining the moisture content of the frozen material. Plaintiffs rely upon a presumption that seasonal frost would have disappeared by the peak months of the construction season so that the only remaining frozen material must have been permafrost. In view of the evidence available in the administrative record, plaintiffs' contention that the Board's finding was arbitrary, capricious, grossly erroneous, and not supported by substantial evidence cannot be sustained.

Plaintiffs further contend that the findings of the Board with respect to the suitability of the frozen soil as construction material violate the Wunderlich Act standards. Specifically, plaintiffs challenge the Board's holding that the soils encountered were relatively good construction materials and any difficulty with the materials should have been anticipated, and that the soil surveys performed by the Government accurately determined the suitability of the soil as construction material. The Board's findings concerning the suitability of the frozen materials are phrased in the following language:

> * * * There is, however, substantial evidence to indicate that the material in these frozen areas was a satisfactory fill material when dry and that it did, in fact, dry out and produce a good stable road. This fact is shown in both the results of the original soil investigation and in the results of the post-construction soils investigation.

It is plaintiffs' position that the frozen material did not constitute satisfactory construction material because in its frozen state, it was unstable and extremely difficult to excavate and handle in the construction work. Plaintiffs also maintain that the soil surveys conducted by the Government cannot properly be used to determine the suitability of the construction materials because certain deficiencies in the method of conducting the surveys rendered the survey results unreliable and the standards used to evaluate the results of the surveys were not applicable to the problem of handling the construction materials. There is, however, substantial evidence in the record to support the Board's finding that the material encountered in the frozen areas did constitute satisfactory fill material when dry. A Government witness testified that the frozen material, encountered in excavation areas of the construction project, produced suitable construction material when placed in embankment and allowed to dry. His testimony also described the methods of using permafrost as construction material. Plaintiffs have not indicated any evidence in the record to contradict this testimony, and it does not directly attack the Board's finding with respect to the suitability of permafrost as the construction material when dry. Plaintiffs' objection to the Board's finding is grounded upon the evidence in the record concerning the difficulty encountered in excavating and handling frozen material. Plaintiffs also rely upon the testimony of their witnesses to the fact that the frozen material used in the construction contained a substantial percentage of silt. Plaintiffs point out that one of the Government representatives employed by the Alaska Road Commission estimated that some of the material in the construction area contained between 25 and 50 percent silt. Such material is known as silty till and is unsuitable for most construction purposes because of its susceptibility to frost and its high percentage content of fine material. In addition, however, he testified that all but one of the areas of silty till were avoided in planning the route which the proposed roadway was to follow. In view of the evidence of record regarding the suitability of the construction materials and the acceptable

methods of employing permafrost as a construction material, and the fact that plaintiffs actually did use permafrost in the roadway construction to produce a satisfactory road, it is concluded that the Board's finding with respect to the suitability of the construction materials has substantial support in the record and is not arbitrary, capricious, or grossly erroneous.

The Board stated, in its opinion, that the results of the soil surveys conducted by the Government supported the finding that the material in the frozen areas was a satisfactory fill material when dry and that it did dry out to produce a stable road. The post-construction survey conducted in 1963 indicates that a substantial portion of the completed roadway consists of material which is classified as suitable for subgrade under the standards of the American Association of State Highway Officials (A.A.S.H.O.) and that only a small portion of the survey samples would be accorded a fair-to-poor rating. There is testimony in the record to establish that the results of the 1963 survey corresponded with the results of prior surveys conducted in 1955 and 1959. Plaintiffs challenge the appropriateness of the Board's relying upon the survey results in reaching any of its conclusions. Plaintiffs' objections are based on their contentions that the 1963 survey results are unreliable because of defects in the procedure of collecting soil samples and measuring amounts of material present in the samples and that the surveys did not purport to evaluate the difficulties involved in working with the construction materials. As stated above, there is evidence in the record to indicate that the 1963 survey results are consistent with the results of the surveys of 1955 and 1959. From the consistency of the results of the different surveys, it can be concluded that the surveys were conducted with some accuracy. Plaintiffs' objection to the Board's reliance on the survey results to support its conclusions concerning the suitability of the construction materials is not well founded.

The fact that the A.A.S.H.O. standards do not measure the difficulty involved in handling construction materials does not render the survey results valueless in determing the suitability of the materials used in the roadway construction. The A.A.S.H.O. standards are intended to evaluate the durability of the completed road, and it was not improper for the Board to use the standards to determine the suitability of materials, when dried, for use in roadway construction.

Plaintiffs also object to the Board's finding that a biddder on this project should have expected that even relatively good subgrade materials would be difficult to handle when excavated in a frozen condition. This finding is closely related to the Board's conclusion that an experienced contractor should have expected that permafrost or frozen conditions would be encountered in the excavation of materials in the construction work. Plaintiffs' contentions with respect to that conclusion have already been considered and the Board's conclusion has been upheld. In deciding the question of finality of the Board's finding in this instance, it is appropriate to consider the same factors which were relevant in reaching a decision on the Board's conclusion relating to whether or not permafrost should have been anticipated. These factors include: the warnings contained in the pre-bid notice and the contract documents, the fact that the construction project was located in an area of Alaska where permafrost and severe seasonal frost generally occur, the available soil reports, and the fact that plaintiffs had previous construction experience in Alaska. In addition, there is testimony in the record to indicate that permafrost was encountered in the original soil survey (1955) in even the best construction materials. Plaintiffs rely upon oral statements by Government representatives to the effect that any permafrost encountered would not have to be excavated and upon a description of the construction work appearing in the pre-bid notice which described the work in the first half of the

project as "featured by short, heavy cuts and fills in good material where the esker cannot be followed exactly * * *" to establish its contention that the Board's finding is arbitrary, capricious, and not supported by substantial evidence. Upon consideration of the evidence of record pertaining to the Board's finding, it is concluded that plaintiffs' objection to the finding is not well founded since there is ample support in the record for the Board's decision that the difficulty of handling frozen construction material should have been anticipated.

Finally, plaintiffs charge the Board with error in holding that there is no convincing evidence that conditions encountered differed from those warned against or to be expected. In order to controvert this finding of the Board, plaintiffs rely upon the contract drawings showing five areas of permafrost, the pre-bid notice describing the work as "relatively easy and in good material * * *", and the advice from Government representatives that excavation of permafrost would be avoided in the construction work. It is plaintiffs' contention that the permafrost conditions encountered were much more difficult than those which could have been reasonably anticipated in view of representations made by the Government concerning the availability of good construction materials, the relative ease of performing the work, and the absence of permafrost. The Government has indicated, however, substantial evidence in the record to support the Board's conclusion. This evidence includes: the soil reports available at the Glen Allen field office, the warnings of frozen ground and permafrost contained in the pre-bid notice and the contract documents, the general knowledge of the existence of permafrost in the construction area, and plaintiffs' prior experience with construction work in Alaska. It has already been determined that the Board's holding that plaintiffs should have expected to encounter permafrost in the construction work is not erroneous under the Wun-

derlich Act review standards. In view of this holding and the evidence in support of the Board's conclusion cited by the Government, there is no reason to overturn the Board's decision in this instance.

### Issues of Law

Plaintiffs have charged the Board of Appeals with error of law in deciding that plaintiffs were not entitled to an equitable adjustment under the contract in the circumstances of this case. It is plaintiffs' first contention that the Board employed an incorrect burden of proof in evaluating the evidence presented by plaintiffs to establish their claims under the "Changes" and "Changed Conditions" clauses of the contract. Plaintiffs object to the use of the term "convincing evidence" in the Board's decision to describe the conclusions reached by the Board on the basis of the facts presented in the administrative record. The portion of the Board's opinion in which this terminology appears is set forth below.

> There is no question regarding the fact that the contractor did encounter frozen ground and materials. However, there is not convincing evidence to indicate that the material encountered was permafrost as permafrost is commonly defined, i.e., permanently frozen ground. Nor is there convincing evidence that conditions encountered differed from those warned against or to be expected.

Plaintiffs maintain that the Board's decision is erroneous as a matter of law because the Board required plaintiffs to prove their case by "convincing evidence," a standard much stricter than a preponderance of the evidence which is the standard normally used in civil actions. The fact that the Board used the term "convincing evidence" in its opinion does not justify the conclusion that it departed from the usual standards for evaluating evidence in civil actions. It is merely indicative of the Board's decision that, after weighing the conflicting evidence in the record, it was not con-

vinced that plaintiffs' version of the circumstances of the case had been established as fact. In reviewing the conclusions of fact reached by a Board of Appeals, this Court is limited to a review to determine whether such conclusions are supported by substantial evidence in the administrative record. This Court has indicated that the substantial evidence standard is satisfied when there is evidence in the record to convince a reasonable man of the truth of the facts to which the evidence is directed. Koppers Co. v. United States, supra, 405 F.2d at 557, 186 Ct.Cl. at 148, 149; Turnbull, Inc. v. United States, 389 F.2d 1007, 1014, 180 Ct.Cl. 1010, 1024 (1967). Since a review of the factual matters decided by the Board has already been made in this case and substantial evidence has been found to support the Board's decision, it does not appear that the Board's use of the term "convincing evidence" affected the correctness of its evaluation of the evidence presented in this case. It is concluded that the Board's opinion is not rendered erroneous as a matter of law because the term "convincing evidence" was used in the discussion of the manner in which the Board evaluated the available evidence.

■ The remaining issues of law raised by the plaintiffs are considered in the discussions of plaintiffs' "Changed Conditions" and "Changes" claims which follow. Plaintiffs have asserted that they are entitled to an equitable adjustment under the "Changed Conditions" provision of the contract for the cost of excavating frozen material not indicated in the contract specifications. This provision is the standard "Changed Conditions" clause used in construction contracts with the Government and provides for an equitable adjustment if the contractor encounters: (1) subsurface or latent physical conditions at the site differing materially from those indicated in the contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract. This Court has held that a changed condition is encountered when the condition could not have been reasonably anticipated from an examination of the site or from a study of the contract drawings and specifications. Farnsworth & Chambers Co. v. United States, 346 F.2d 577, 171 Ct.Cl. 30 (1965). In Clack v. United States, 395 F.2d 773, 777, 184 Ct. Cl. 40, 46–47 (1968), this Court stated that the "Changed Conditions" provision of a constuction contract is intended to authorize an adjustment of the contract price only with respect to physical conditions that were unknown to, and could not reasonably be anticipated by, the parties at the time they entered into the contract.

■ When the Government is in possession of information pertinent to the construction work to be performed under the contract, there is a duty to fully disclose and furnish to the contractor the facts of which the Government has knowledge. Leal v. United States, 276 F.2d 378, 383, 149 Ct.Cl. 451, 460 (1960). In the event of a failure to disclose available information which has the effect of misleading the contractor with respect to the conditions existing in the construction area, the contractor is entitled to an equitable adjustment under the "Changed Conditions" clause. Leal v. United States, supra. The result is similar in the case of a misrepresentation by the Government concerning the existing conditions. Mere proof of a misrepresentation is not, in itself, sufficient basis for an equitable adjustment under the "Changed Conditions" clause, for it must also be shown that the contractor was actually misled by the Government's misrepresentation. Morrison-Knudsen Co. v. United States, supra. In Flippin Materials Co. v. United States, 312 F.2d 408, 160 Ct.Cl. 357 (1963), this Court held that a contractor was not entitled to an equitable adjustment for a changed condition on its claim that the Government withheld pertinent information because the contract

documents referred to the available information and told the contractor where the information could be found. Thus, it appears that a failure by the Government to disclose pertinent information or a misrepresentation by the Government concerning conditions at the construction site will not enable a contractor to obtain an equitable adjustment for a changed condition if the contractor has another source of information concerning the conditions or if the contractor is not misled by the Government's misrepresentation or failure to disclose.

In the present case there was a pre-bid notice issued to prospective bidders which warned that frozen ground would present unpredictable problems in the construction work. The notice stated that a soil survey was being conducted in the construction area at that time. Plaintiffs' representatives conducted an inspection of the construction area and were informed of the availability of soil reports from the soil survey performed along the proposed route of the roadway. Because of the weather conditions existing at the time of the inspection, only a limited amount of information about the construction site could be obtained from the inspection. When the Government issued an invitation for bids, the invitation expressly provided that permafrost encountered in the soil survey had been shown in the contract drawings, and that no representation was made concerning whether or not permafrost would be found in areas other than those shown in the drawings. The contract contained a warning of the pioneer nature of the construction project situated in an area of Alaska where permafrost was a common occurrence. Plaintiffs were experienced contractors and had previously performed construction work in Alaska. Plaintiffs were aware of the fact that approximately 80 percent of the area of Alaska in which the construction project was located is underlaid with permafrost. Finally, in a letter to the Contracting Officer for the Alaska Road Commission, plaintiffs admitted that they did expect to encounter more permafrost than indicated in the contract drawings, but not in the amounts which were actually encountered in the construction work.

In view of the above facts, it is concluded that plaintiffs did not encounter a changed condition in this case because the existence of permafrost or frozen conditions in the construction area should have been anticipated from the available information. Plaintiffs had been warned by the Government of the occurrence of permafrost and frozen conditions in the area where the roadway was to be constructed. Furthermore, plaintiffs realized the inadequacies of their inspection of the construction area and should have shown interest in the soil survey to which attention was directed. The fact that plaintiffs admitted they had anticipated the condition for which they are claiming an equitable adjustment provides strong support for the conclusion that a changed condition was not encountered. Clack v. United States, *supra*.

Plaintiffs have cited the cases of Fehlhaber Corp. v. United States, 151 F.Supp. 817, 138 Ct.Cl. 571 (1957), *cert. denied*, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108, and United Contractors v. United States, 368 F.2d 585, 177 Ct.Cl. 151 (1966), in support of their position that a contractor has the right to rely upon the Government's specifications and drawings to determine the conditions to be expected in a construction project. This is a valid principle, but it does not, in itself, determine whether or not a changed condition exists. Flippin Materials Co. v. United States, *supra*. The ultimate question in every case is whether the conditions encountered by a contractor were materially different from those reported in the specifications of the contract. Fehlhaber Corp. v. United States, *supra*, 151 F.Supp. at 825, 138 Ct.Cl. at 585. In the present case the contract drawings indicated permafrost in five locations along the proposed route of the roadway. The drawings contained no representations concerning the existence of per-

mafrost along the remainder of the proposed route. The contract specified that no representation was made that permafrost would not be found in areas other than those shown in the drawings. Plaintiffs encountered permafrost or frozen ground in 41 locations during the construction work. The fact that plaintiffs found permafrost in locations not indicated in the contract drawings does not establish that the conditions encountered by plaintiffs were materially different from those indicated in the specification of the contract.

It is plaintiffs' contention that the difference between the amount of permafrost actually encountered in the construction work and the amount indicated in the contract drawings warrants a conclusion that a changed condition existed. Plaintiffs encountered 206,846 cubic yards of frozen material in the excavation performed on the construction project. The contract drawings indicated permafrost in only one area where excavation was required. The amount of frozen material found in this area was 1,965 cubic yards. Although there was a substantial difference between the amount of frozen material actually encountered and the amount originally indicated, the fact of a substantial variation does not, in itself, justify a conclusion that there was a changed condition. Perini Corp. v. United States, 381 F.2d 403, 410–411, 180 Ct.Cl. 768, 770–771 (1967).

Plaintiffs have also asserted that they are entitled to an equitable adjustment under the "Changes" provision of the contract for the cost of placing excavated frozen material in the roadway as subgrade and embankment. The "Changes" provision allows the contracting officer to make changes, in writing, in the drawings or specifications of the contract and provides for an equitable adjustment in the contract price for the changes. Although the provision contemplates written change orders, this Court has recognized the right of a contractor to an equitable adjustment on the theory of constructive change in cases where no written change order was issued. Jack Stone Co. v. United States, 344 F.2d 370, 170 Ct.Cl. 281 (1965); Gholson, Byars & Holmes Constr. Co. v. United States, 351 F.2d 987, 173 Ct.Cl. 374 (1965); and Turnbull, Inc. v. United States, *supra*.

During the construction work under the contract, plaintiffs requested the permission of the contracting officer to waste excavated material encountered in a frozen condition and to substitute borrow material in the construction of subgrade and embankment. One of the provisions of the contract (Paragraph 24–3.1, of Specification FP–41) required that all suitable material removed from the excavations was to be used in the formation of embankment and subgrade. It further provided that no excavated material was to be wasted without written permission of the contracting officer. Another provision of the contract (Paragraph 21–2.1 of Specification FP–41) described the material to be used in the formation of embankments. It provided that such material was to consist of suitable material approved by the engineer and that the embankments were to contain no muck. It is plaintiffs' contention that the contracting officer's refusal to permit the excavated frozen material to be wasted constituted a constructive change since the material was unsuitable for use in the construction work in view of the contract provisions relating to construction materials. Plaintiffs' claim for an equitable adjustment under the "Changes" provision of the contract is based upon the contention that they were required to perform an act which was prohibited by the terms of the contract.

When the facts of this case are considered, it is evident that plaintiffs were not required to perform any act which they were not already obligated to perform under the contract. The contract required that excavated material be used as fill in the roadway construction. No material could be wasted without the permission of the contracting officer. When the contracting officer refused to

allow plaintiffs to waste the excavated frozen material, he was exercising discretion given to him under the terms of the contract. As mentioned in a previous portion of this opinion, there is substantial evidence in the record to indicate that the material used in the roadway construction produced a *satisfactory* road. This fact indicates that the contracting officer did properly exercise his discretion in refusing to allow the excavated material to be wasted. Although plaintiffs objected to the use of A.A.S.H.O. standards in the evaluation of the materials used in the roadway construction, plaintiffs have proposed no alternative objective standard of evaluation. It is plaintiffs' position that the suitability of the materials should be considered from the viewpoint of handling and excavating the materials. The A.A.S.H.O. standards are intended to test the durability of the completed road. For this reason it is not improper to use the standards to support a conclusion that the completed road was satisfactory and that the materials used in its construction were suitable. Since the roadway construction was performed in accordance with the terms of the contract and the final result was a satisfactory road, there is no reason to allow the plaintiffs to recover an equitable adjustment under the "Changes" provision of the construction contract.

Finally, it is plaintiffs' contention that the controversy concerning the definition of the term "suitable material" used in the contract is governed by the case of Topkis Bros. Co. v. United States, 297 F.2d 536, 155 Ct.Cl. 648 (1961). In that case, this Court decided that where the Government, under the contract, was obligated to furnish cloth "suitable for use" in the manufacture of field jackets, the material furnished by the Government was required to be suitable for use in the process of manufacturing the finished product. The Government's contention that the contract provision merely required the material to be suitable for use in the end product was not adopted by the Court. That case does not control the decision in the instant case because the Government was not obligated to furnish any material in the instant case and the contract documents merely described the condition of existing materials in the construction area. There was no promise or warranty by the Government that the contractor would encounter only suitable material in the performance of the contract.

In summary, there is no proper basis in this case to overturn the Board's decision that plaintiffs are not entitled to an equitable adjustment under the "Changed Conditions" or "Changes" provisions of the contract.

Plaintiffs' claim that they are entitled to recovery outside the contract provisions for breach of contract has not been considered separately because such claim is entirely redressable under the "Changed Conditions" and "Changes" provisions of the contract. L. W. Foster Sportswear Co. v. United States, 405 F.2d 1285, 1290, 186 Ct.Cl. 499, 507, 508 (1969).